**IOWA GLASS DEPOT, INC., Appellant,**

v.

**Robert JINDRICH, Appellee.**

**No. 69247.**

Supreme Court of Iowa.

Sept. 21, 1983.

Susan E. Harman of Lynch, Dallas, Smith & Harman, Cedar Rapids, for appellant.

Thomas D. Hobart and William L. Meardon of Meardon, Sueppel, Downer & Hayes, Iowa City, for appellee.

Considered by REYNOLDSON, C.J., and HARRIS, McCORMICK, SCHULTZ, and CARTER, JJ.

SCHULTZ, Justice.

This appeal presents issues concerning the enforceability of a covenant not to compete contained in an employment contract. At trial the district court denied the employer, Iowa Glass Depot, Inc., (Glass) the injunction it sought against its ex-employee, Robert Jindrich. We affirm.

Glass has been in the business of selling and installing automobile glass for more than 50 years. It has twelve retail outlets, including an Iowa City store that has been in operation since 1969.

In 1970 Jindrich, a high school student, began working part-time for Glass in its Iowa City outlet. After graduation he started working full-time as an installer-trainee. He was promoted to the position of manager of the Burlington outlet in 1973. He received further promotions when he became manager of the Iowa City outlet in 1975 and manager of the Davenport outlet in 1981.

As manager of an outlet Jindrich was responsible for sales, solicitation of business, inventory, bookkeeping and installation of glass. He was aided by two employees, a secretary and an installer.

In the later months of 1976, after a manager in Mason City left Glass and started a competing business, Glass decided that each manager would be asked to execute an em-

ployment contract containing a covenant not to compete. Although he never previously had a written employment contract with Glass, Jindrich executed such a contract on November 18, 1976.

Following his last promotion, Jindrich began his duties in Davenport on January 1, 1981. He was not asked to sign another employment contract at that time. Because of marital difficulties he did not move to Davenport but commuted from Iowa City until September 17, 1981, the day he voluntarily terminated his employment with the company.

After his termination Jindrich was unable to secure full-time employment and worked part-time in mobile home sales and service. In December 1981 Jindrich and a friend formed a partnership named Glass Services. This partnership commenced to sell, repair and install all types of glass in the Iowa City area. As a partner in the business, Jindrich occasionally contacted and sold auto glass to some of the same customers he had served while he was an employee of Glass.

On December 14, 1981, Iowa Glass brought a suit in equity seeking an injunction against Jindrich to enforce the covenant not to compete in the selling or installing of auto glass. The trial court held that the parties abandoned the employment contract and the covenant not to compete when Jindrich accepted employment in the Davenport outlet.

The initial issue on appeal is whether or not the employment contract was abandoned. If Glass is correct in its assertion that the contract was not abandoned, secondary issues arise concerning the validity of the covenant. The parties cannot agree whether there was adequate consideration for the covenant and whether in the circumstances the covenant was reasonable.

Each issue has its source in the written employment contract. The pertinent portions of this form contract are as follows:

1. First Party agrees to employ Second Party as a Salesman for the purpose of selling and installing auto glass which has been purchased by customers from First Party. The employment of Second Party shall also include the solicitation of orders for the sale and installation of auto glass. The place of employment of Second Party shall be the place of business of First Party in the City of Iowa City, the business address of which is 113 Stevens Road, in said city. The place of employment shall also include the county in which that city is located. The installation of the auto glass shall be made at the place of business of First Party in that city, or at such other place within the county which is necessary to secure the sale of the auto glass.

4. The employment of Second Party shall continue so long as his services are satisfactory to First Party. However, both parties reserve the right to terminate the employment under this agreement by giving notice to the other as hereinafter provided.

7. Both parties recognize that Second Party will be the key man who will be responsible for the development of the business of First Party in the city and county above named. Second Party will be the person who will be in direct contact with the customers of First Party in that area. Both parties expect that through the efforts of Second Party, for which he will be compensated in accordance with the terms of this agreement, a substantial patronage and good will should be developed within the area covered by this agreement. Both parties recognize that the nature of the services to be rendered by Second Party are such that it might be very detrimental to First Party if Second Party was privileged to terminate his employment under this agreement and enter into competition with First Party within the area covered by this agreement.

8. Second Party agrees that, upon the termination for any cause of his employment under this agreement, he will not for a period of three (3) years thereafter,

either directly or indirectly engage in the business of selling or installing auto glass or soliciting orders for the sale and installation of auto glass in the City of Iowa City, or the County in which that city is located. Second Party further agrees that he will not within that time, or within that area, in any manner, directly or indirectly, attempt to hire the employees of First Party engaged in the business of selling or installing auto glass, or attempt to take away any of the auto glass customers of First Party, within the City of Iowa City, or in the County in which that city is located, during the period of three (3) years from the date of the termination of his employment.

■ I. *Abandonment.* Abandonment of a contract is "the relinquishment, renunciation or surrender of a right. Its existence depends upon intention and acts evidencing intention to abandon." *Storck v. Pascoe,* 247 Iowa 54, 64, 72 N.W.2d 467, 472–73 (1955). The act of relinquishment must be unequivocal and decisive. *Id.* 247 Iowa at 64, 72 N.W.2d at 473.

■ Abandonment of a valid contract may be accomplished by express agreement of the parties, or the parties, by conduct inconsistent with the continued existence of the original contract, may estop themselves from asserting any right thereunder. *Severson v. Elberon Elevator, Inc.,* 250 N.W.2d 417, 421 (Iowa 1977). Since there is no express agreement to abandon this contract, we must examine both the acts of the parties and the contract itself to determine whether the parties unequivocally and decisively relinquished their rights under the covenant.

Jindrich claims that the contract of employment was abandoned or terminated by his transfer to Davenport. In his brief he cites no authority for his position and only reaches this contention as a part of his claim that he did not breach the employment contract. Neither party breached the terms of the contract of employment, since the transfer to Davenport was mutually acceptable. Nonetheless, the question of abandonment of the covenant remains.

■ The specific terms of paragraph 8 of the agreement provide that the restriction will take place "upon the termination for any cause of his employment under this agreement." The restrictive covenant is ancillary to the employment contract and, by its terms, only becomes enforceable upon termination of employment under the contract. Thus, while the oral agreement between the parties concerning Jindrich's transfer to Davenport at a new salary supports an inference Jindrich terminated his employment under the contract, this conduct is not inconsistent with continued existence of the covenant not to compete in Iowa City. Indeed, the record supports a contrary conclusion. Glass testified at trial that no new written contract was entered into restricting competition in the Davenport area because Jindrich was still living in Iowa City. Both the absence of a new written contract covering the Davenport location and Jindrich's continued residence in Iowa City are wholly consistent with the inference the employer still desired protection in Iowa City and did not intend to abandon the covenant not to compete.

Based on our de novo review of the record, we conclude Jindrich has not established that the parties unequivocally and decisively relinquished their rights under the covenant. As noted earlier, we can infer that the transfer was a termination of the Iowa City employment on January 1, 1981, and triggered the time limitation clause contained in the covenant. Since we disagree with the trial court's determination that the covenant not to compete was abandoned, we find it necessary to examine the other claims concerning the validity of the covenant provisions of the contract.

II. *Validity of the covenant not to compete.*

*A. Consideration.* Jindrich argued to the trial court that the covenant not to compete was unenforceable because it lacked consideration. He points out that he was already employed as a manager when he signed the employment contract and re-

ceived no additional compensation, security, promises or other benefits for the covenant. As the trial court did not reach this issue, we must decide it without the aid of an initial determination.

■ We agree with Jindrich on the facts that he has outlined. Nevertheless, we also must consider that Jindrich retained his employment and prospered from it for several years. We held in *Farm Bureau Services Co. of Maynard v. Kohls,* 203 N.W.2d 209 (Iowa 1972) and *Ehlers v. Iowa Warehouse Co.,* 188 N.W.2d 368 (Iowa 1971) that continued employment for an indefinite period of time is sufficient consideration to support a covenant not to compete. Although other jurisdictions are evenly split on the question of whether continued employment by itself is adequate consideration, *see Davies and Davies Agency, Inc. v. Davies,* 298 N.W.2d 127, 130 (Minn.1980), we find no compelling reason to overrule our prior decisions. This is especially true since we determine the covenant is invalid for reasons indicated hereafter.

*B. Reasonableness of the contract.* Issues concerning the validity of covenants not to compete have been a cause of much litigation and have provided a generous source of material for legal writers. There is a fair consensus on the rules governing restraints on competition in employment contracts, but difficulty frequently arises in applying the rules to individual cases. Both parties agree on the basic rules but disagree about the conclusions that may be drawn from the facts in this case.

■ The general rule in Iowa is that we will enforce a noncompetitive provision in an employment contract if the covenant is reasonably necessary for the protection of the employer's business and is not unreasonably restrictive of the employee's rights nor prejudicial to the public interest. *Ehlers,* 188 N.W.2d at 369. Our rule is analogous to the Restatement rule which provides that a noncompetitive agreement is unreasonably in restraint of trade if "(a) the restraint is greater than is needed to protect the promisee's legitimate interest or (b) the promisee's need is outweighed by

the hardship to promisor and the likely injury to the public." Restatement (Second) of Contracts § 188(1). Essentially, these rules require us to apply a reasonableness standard in maintaining a proper balance between the interests of the employer and the employee. Although we must afford fair protection to the business interests of the employer, the restriction on the employee must be no greater than necessary to protect the employer. Moreover, the covenant must not be oppressive or create hardships on the employee out of proportion to the benefits the employer may be expected to gain. *Mutual Loan Co. v. Pierce,* 245 Iowa 1051, 1055, 65 N.W.2d 405, 407 (1954); *Brecher v. Brown,* 235 Iowa 627, 630–31, 17 N.W.2d 377, 379 (1945). The burden of proving reasonableness is upon the employer who seeks to enforce such a covenant. *Pierce,* 245 Iowa at 1056, 65 N.W.2d at 408.

■ Assessment of the reasonableness of noncompetitive covenants generally requires us to examine both the time and area restrictions contained in the covenant. Although Jindrich argued at trial that the time and area limitations were unreasonable, his argument on appeal is confined to his claim that Glass did not show the covenant was necessary to protect its business or that the entire covenant was reasonable in the circumstances of the case. A proposition advanced at trial but not argued on appeal is deemed waived. *Anderson v. Hadley,* 245 Iowa 550, 554, 63 N.W.2d 234, 236 (1954). Consequently for the purposes of this appeal, we will not individually scrutinize the time and area restrictions.

■ Our failure to focus on time and area, however, does not relieve Glass of its initial burden to prove that a restrictive covenant was reasonably necessary to protect its business. Nor does it relieve this court of its duty to weigh the countervailing interests of the employer and employee and assess whether the detriment suffered by Jindrich is outweighed by the potential benefits Glass would derive from enforcement of the covenant. *See* Restatement

(Second) of Contracts § 188(1) comment (d).

■ Glass claims that it has met its burden to show that the covenant here is reasonably necessary for its business. It points out that Jindrich, by virtue of his employment, had extensive and close contact with its customers. Essentially, Glass relies on our prior cases upholding noncompetitive covenants when the employee is placed in a position of close customer relationship and has an opportunity to pirate customers from the employer at the termination of his employment. Prior to our review and assessment of these cases, we must point out that reasonableness of the restraint and the validity of the covenant seldom depend exclusively on a single fact. Rather, all the facts must be considered and weighed carefully, and each case must be determined in its entire circumstances. Only then can a reasonable balance be struck between the interests of the employer and the employee. *Barker v. Starkey,* 259 Iowa 480, 495, 144 N.W.2d 889, 897–98 (1966).

In justifying restraints enforced against an employee, we have often relied upon the employee's close proximity to customers along with peculiar knowledge gained through employment that provides a means to pirate the customer. *Kohls,* 203 N.W.2d at 211; *Ehlers,* 188 N.W.2d at 373; *Orkin Exterminating Co., Inc. v. Burnett,* 259 Iowa 1218, 1222–23, 146 N.W.2d 320, 324 (1967); *Cogley Clinic v. Martini,* 253 Iowa 541, 112 N.W.2d 678, (1962); *Federated Mutual Implement and Hardware Insurance Co. v. Erickson,* 252 Iowa 1208, 1215–16, 110 N.W.2d 264, 267 (1961); *Sioux City Night Patrol v. Mathwig,* 224 Iowa 748, 752–53, 277 N.W. 457, 460 (1938). Where there is little customer contact, we have refused to enforce the covenant on the basis that the restriction was unreasonable. *Pierce,* 245 Iowa at 1059, 65 N.W.2d at 408.

■ Proximity to customers is only one aspect. Other aspects, including the nature of the business itself, accessibility to information peculiar to the employer's business, and the nature of the occupation which is restrained, must be considered along with matters of basic fairness. 54 Am.Jur.2d, *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 512 at 959 (1971). Jindrich's position as a manager did place him in close proximity with his employer's customers. Although his position bears some similarity with the employees' positions in prior cases where restrictive covenants were upheld, other important differences support Jindrich's claim that the covenant was not necessary to protect Glass's business.

Glass's managers received little training. An employee could learn installation of auto glass by on-the-job instructions in anywhere from one to thirty days, depending on his mechanical ability. The sales training was also unsophisticated. The district representative taught them to use the yellow pages of the telephone book to acquaint themselves with the names of potential customers such as insurance agencies and auto repair shops. Managers were allowed to take a Dale Carnagie course. Thus, Jindrich received little specialized training and there were no trade secrets or exclusive customer lists which he could purloin. In summary, we conclude Jindrich, unlike many of the employees in our previous cases, did not receive from his employer nor did he possess any special training or peculiar knowledge that would allow him to unjustly enrich himself at the expense of his former employer. *See Orkin,* 259 Iowa at 1222, 146 N.W.2d at 323 (employee given eight weeks' training in exterminating insects and methods of operation); *Federated,* 252 Iowa at 1215, 110 N.W.2d at 268 (insurance company's agent had intimate knowledge of customer list, policyholders' insurance needs and, undoubtedly, policy expiration dates); *Cogley Clinic,* 253 Iowa at 544, 112 N.W.2d at 679–80 (cost clinic $10,000 to train a new doctor and doctor's acquaintance with patients, referral doctors, hospital personnel and local procedures was through his association with the clinic); *Mathwig,* 224 Iowa at 753, 277 N.W. at 460 (employee's position made him privy to con-

fidential information about his employer's business and the property of its customers).

. We also believe that Jindrich did not fall into the classification of what we might refer to as a route case. In *Kohls,* the employee was given a designated area in which he routinely serviced his employer's customers. 203 N.W.2d at 210. Similarly, in *Orkin* the employee was given an established route where he regularly serviced the company accounts. 259 Iowa at 1224, 146 N.W.2d at 323. In referring to route cases, we stated in *Pierce* that in these cases "the employee has had a close contact with the employer's customers and it is only fair on termination of his employment there be an interval when a new employee will be able to get acquainted with the customers." 245 Iowa at 1058, 65 N.W.2d at 409. We believe from the testimony of the witnesses that Glass's business in Iowa City did not lend itself to the type of close personal relationship with the customers that a normal route salesman ordinarily would develop.

The outlet was described as the store or shop. Glass's management stated that the business was no different than a hamburger store where everyone is a customer. The manager went out from the outlet at times to solicit business; however, there was no established routine of calls and service to customers. Primarily, it is a walk-in business. Moreover, the glass business in Iowa City is highly competitive. There are four major glass distributing agencies there along with numerous body shops and garages that install their own auto glass. The large customers such as insurance companies, body shops, and auto dealers used several different suppliers and were not exclusive customers of Glass. Auto glass sales are primarily generated by the location of the supplier, availability of immediate service and the quality of the work.

Additionally, unlike the route employees in both *Ehlers* and *Kohls,* Jindrich did not attempt to solicit Glass's customers for himself while he was employed by Glass. *Ehlers,* 188 N.W.2d at 373; *Kohls,* 203 N.W.2d at 210. Nor did he avail himself of a list of exclusive customers or other peculiar knowledge gained in employment to pirate away Glass's customers. *Federated,* 252 Iowa at 1215, 110 N.W.2d at 268.

Finally, Jindrich had not worked in Johnson County for almost a year before he went into competition. During this time, he was not in contact with Iowa City customers and was unavailable to them until he set up his partnership in December of 1981. Any opportunity to pirate away customers because of his close proximity to them during his employment was significantly reduced by this prolonged absence from the glass business in the Iowa City area.

In summary, we find that Glass's claim, based on Jindrich's close proximity with customers, has some merit. Nevertheless, we find this claim is considerably weakened by the nature of the auto glass business in Iowa City and by the termination of the relationship between Jindrich and the customers for a period of 11' months. Were this the only evidence that must be considered in covenant not to compete cases, we still might be disposed to grant enforcement, despite Glass's weaker showing of the necessity for protection.

In testing the validity of a restrictive covenant, we must look to the facts and circumstances of the particular case that shed light on the reasonableness of the restraint as applied to the individual interests of both parties. Although an employer has an interest in protecting his business from an employee's use of personal influence or peculiar knowledge gained in employment, the employer has no right to unnecessarily interfere with the employee following any trade or calling for which he is fitted and from which he may earn his livelihood. An employee cannot be precluded from exercising the skill and general knowledge he has acquired or increased through experience or even instruction while in the employment. *Baker v. Starkey,* 259 Iowa 480, 493–94, 144 N.W.2d 889, 897 (1966). Thus we are required to consider the employee's situation and the sur-

rounding circumstances in order to fairly weigh the interests of the parties.

The facts indicate that Jindrich only possessed a high school education and had little training for any other type of employment. Both parties agree he was an excellent manager for Glass and possessed natural sales and management ability. He was undergoing severe financial problems because of a marital breakup and the necessity to support his children. He wanted to remain in Iowa City because he was attempting to gain custody of his children and he wanted to exercise his full visitation rights. Iowa City was also his home and he always had lived there except for the short period of time when he was manager of Glass's outlet in Burlington, Iowa. Finally, despite his innate sales and management abilities, Jindrich was unable to obtain full-time employment after he quit his job at Glass's outlet in Davenport. In addition to these facts demonstrating Jindrich's need to remain in Iowa City, his pressing financial situation, and his inability to obtain full-time employment in the area, another element in this case tilts the balance in Jindrich's favor.

■ Although the consideration may be sufficient to bind a noncompetitive covenant, the court may still consider it in determining whether the consideration is grossly disproportionate to the injury incurred by the covenanter or the benefit accruing to the covenantee from the enforcement of the covenant. 54 Am.Jur.2d *Monopolies, Restraints of Trade, and Unfair Trade Practices* § 513 at 960 (1971).

■ Jindrich signed the covenant not to compete approximately one year after his promotion to manager of the Iowa City outlet. He did not receive any additional compensation, security, promises or other benefits. Glass also testified Jindrich was not required to sign it and no adverse action would probably have been taken if he refused to do so. Thus, while his continued employment served as sufficient consideration for the restrictive covenant, we view Jindrich's gain from the contract to be grossly disproportionate to the injury he would sustain from enforcement of the restrictive covenant. We also find the potential gain to Glass from enforcement does not outweigh the injury Jindrich would sustain.

The general manager of Glass indicated that any management change affected sales. He testified sales would level off during the first year rather than show an increase. He also testified that it usually took a new manager 6 months to establish himself with the customers and offset any detriment created by a change in management. After Jindrich was transferred to Davenport, the 1981 sales of the Iowa City outlet dropped 5 percent. In 1982, the year Jindrich began competing with Glass, sales recovered and were comparable to the 1980 figures. Although Glass claimed that they anticipated a gain in 1982, we note that contrary to the usual pattern the 1981 sales decreased rather than leveling off after the management change.

■ Since the new manager had 11 months without competition from Jindrich to establish himself with the customers and the 1982 sales are comparable to the 1980 sales, we conclude Glass has not shown Jindrich's subsequent competition caused substantial harm to its business. In arriving at this conclusion, we are aware that Jindrich has done business with some of Glass's customers. As noted earlier, these customers were not exclusive customers and seldom did all of their business at one shop. Indeed, despite Jindrich's solicitation of these customers, almost all of them are still doing business with Glass.

Admittedly, not all of our past cases have required a concrete showing of harm from subsequent competition by a former employee as a prerequisite to obtaining enforcement of noncompetitive covenants. *Cogley Clinic v. Martini*, 253 Iowa at 548, 112 N.W.2d at 682. We think, however, the circumstances of this case require a greater showing of harm or, conversely, a greater likelihood of expected gain to Glass before it is entitled to enforce the restrictive covenant.

In summary, we find that the enforcement of the covenant is not reasonably necessary for the protection of Glass's business and would be unreasonably restrictive of Jindrich's rights. For these reasons, we agree that the trial court should have dismissed plaintiff's petition.

AFFIRMED.

All Justices concur except CARTER, J., who dissents.

CARTER, Justice (dissenting).

I dissent. The majority correctly concludes that the trial court erred in finding that the appellant employer abandoned its right to rely on the covenant not to compete. It is wrong, however, in thereafter concluding that the covenant is otherwise unenforceable.

Appellee's status and job responsibilities in appellant's business were such that because of his lead sales role he had the potential to establish relationships with customers of appellant which could be used to appellant's disadvantage if he left his employment to enter into competition with appellant. This potential for damaging appellant's business justifies the exaction of the covenant not to compete and justifies the court's enforcement of the covenant, as written, as against appellee's competitive activities. I would reverse the trial court and grant injunctive relief to the appellant for the period specified in the covenant.